Good morning, Judges. Good morning. I would like to reserve five minutes for any rebuttal. All right. So, Your Honors, in this case, it's an issue of whether or not, as we know, Mr. Moncada was born in New York and had several passports issued to him over the years. And five to six different passports were issued to Mr. Moncada. Although, in this case, his father, who was an attaché. Hold on just a second. She's going to try to clear the hallway. Could you please clear them from the hallway so we can hear? Oh, they're walking from the other courtroom. I see. We'll hold on for just a second. We'll just wait for a few minutes. Yes, Your Honor. If you'd like to go back to counsel table, that'll be fine, counsel. There's about hundreds of people. You let us know when you think it's okay for us to proceed. Thank you.  Oh, yes. It's really... The parking lot is full. That's helpful. All right, counsel. We gave you back your full 15 minutes. You didn't get very far the first time. That's okay. Can we please the court? Thank you. As I stated earlier, Your Honors, Mr. Moncada had in excess of six U.S. passports. Every time that he filed for those six U.S. passports, at the beginning of 1978 and 1980, there's questions in Managua whether or not Mr. Moncada was subject to the jurisdiction of the United States, and unequivocally, the State Department answered yes. There's no indication whatsoever that he... That pattern is so compelling because it seems like this, if it was a mistake, that it was repeated for decades. Yes, Your Honor. But I don't think you're relying on estoppel, and again, it is a very compelling situation. I'm trying to figure out where is the legal error. The error is from the district court's analysis of reliance only on Donovan. I didn't take the district court to be relying on Donovan as conclusive. There were other evidence, other records provided that supported this. What's the best evidence that you got in the record that would support your claim? Because it seemed like most of the evidence was from the government. Some of the evidence says that there's no A-1 visa. The diplomatic visa was not even issued to Dr. Moncada at the time. In fact, Dr. Moncada entered the United States, then at that point later on got a post to work in New York. The other point is that we... Can I just, why is it meaningful that there wasn't a diplomatic visa? I don't, what's the legal significance of this? Because the diplomatic visa then would have allowed the State Department to issue him the immunities that were necessary. So I think what you're saying is that typically one would expect that if someone were coming over as part of a diplomatic mission, they would have a diplomatic visa, is that what you're telling me? Yes. Is there evidence in the record indicating that that was the routine practice at the time? Your Honor, the routine practice, that's not in the record. What is not in the record is that there was no visa issued. Also in the record, there's no evidence a request was made to ask whether or not Dr. Moncada was in fact having immunities, and there was no record found. Even Donovan testified that there was no record found whatsoever regarding that. And that is at the root of the government's repeated mistakes over decades of identifying Mr. Moncada as a citizen. But you agree that we're bound by the Mundaka Vega shifting burdens. So the government, after your client produced a passport, the government has to establish by clear and convincing evidence. Yes. There is what they argue is a conclusive certification. But beyond that, they provide circumstantial evidence in terms of many different documents that are all consistent with him enjoying diplomatic immunity at the time. Yes, Your Honor. There's another issue. Dr. Moncada was a delegate. He's an attache. He's attached, as I've argued in my motion. And he's attached to the ambassador. The ambassador, Mr. Sakasa, Dr. Sakasa, was actually in Washington, D.C. There was no permanent mission for two countries. One of them was Nicaragua, and the other one was Liberia in 1950. So the problem was there's a mistake made. There's an error of fact that the New York delegation was attached, was an attache. And therefore, the problem is that the State Department and the USUN mistakenly thought that that was the permanent mission. But it was not. The permanent mission was in Washington, D.C., 234 miles away. So this is the evidence, Judge Johnstone's calling your attention to the burden shifting. And your contention is that the evidence that defeats the government's case is what exactly? Is the fact that Dr. Moncada was not named. There was no principal named in the blue list that the government put together. There needs to be a name of the principal. And the principal would have been the ambassador. Is there testimony to this point? There's no testimony, but there is an argument being made regarding that point. And that's on the file that was not in the USUN blue list. List persons upon U.S. mission to the United Nations conferred privileges and immunities. The title and name where the principal diplomat appears on this page 12 document 143.1 was filed. And see Exhibits 3 to 5. Exhibits 3 to 5 is in the record. And it does state in there that the principal diplomat needs to be appearing on the list. Exhibit 3 to 5 is what? Is that somebody's declaration? What is that? That was actually from the district court. The district court's findings of fact. And in particular, I'm looking at page 12, paragraph 55. Okay, hang on. Okay, so I'm there. Well, I'm on page 12. Oh, page 12. You don't mean ER, do you mean? Okay. Well, page 12 doesn't have a paragraph 55. Do you mean ER 12 or page 12? Or you might mean paragraph 55. Yes. Paragraph 55 says the document does not list Dr. Moncada's wife, but appears to list the spouses of other individuals. I think I'm in the wrong place. And I want to make sure that I understand your position. When I come back on rebuttal, I'll find the exact question. So just to zoom back a little bit here, we have – would you agree that the President's recognition power, if we had direct evidence of the President's recognition of Mr. Moncada's father as being a diplomat with standard immunity status, that that would be conclusive? It would not be conclusive. How can we question the President's – so, again, and there's an executor at 182, and I'll be interested from the government in terms of the legal effect of that. But what authority do we have to question the President's – if the fact that was established, and I agree with – it wasn't established here. We're trying to establish it through circumstantial evidence. But if the fact that was established and found was that President Truman, in fact, received Mr. Moncada's father as an ambassador under Article II of the Constitution, if that is – if that fact were established, why wouldn't that be conclusive and binding on us under the Constitution? Well, number one, he was not an ambassador. He was an attache. He was a – I'm asking you a hypothetical. I'll have other questions that deal with the record here. Hypothetically, yes, Your Honor. If that was hypothetically, he was received as an ambassador. Okay. And then the problem here is – and your contention is the executor that's at ER 182 does not accomplish that. Correct. Why is that? Because he's not – because, number one, again, the offices are the big problem. The office in New York was not the permanent mission. It was only a delegation. And the mistake was that the USUN made a mistake in assuming that that was the permanent mission. Was it a mistake made by the President or people acting on their behalf, or was it a mistake by the people with authority, or was it a mistake about what the people in authority actually did? It was a mistake by the people in authority assuming that – because every other country at that time, excluding Liberia, was having their permanent mission in New York. And my client's father was only a delegate. What evidence shows that these two countries – the mission wasn't permanently in New York? Your Honor, I have seen that, and I've read that on the record, and I'd have to – Okay, but your answer, not to use all your time, is that we have evidence of that. I've seen that, yes. No, that's – It was attached in there, the countries that were – Nicaragua was one of the countries. Okay. And, in fact, one of the documents in the blue – the blue list that the government relies upon, in that blue list you'll see countries listed, and you'll see Nicaragua in there. You will see Moncada's name in one of the blue lists. But he's not – in there the address is New York, but it does not show who he's attached to, which is required, which I've shown before the Court, and, moreover, that he is not a person part of the permanent mission, just the delegation in New York, which the permanent – which was, again, within – the UN rules would have been within 50 miles of New York City, and Washington, D.C. But according to, I guess – so you'd concede that, however the President wants to determine the terms of who is and who isn't, want to be received as that, as a sufficiently diplomatic officer. Judge Rawlinson. I'm sorry, Your Honor. That's my client. Your Honor, I think my time has expired, but may I reserve that rebuttal? But I understand that the President – Your time has not expired. You have 4.5 minutes. But if you could just say – yeah. So I guess we're just trying to figure out – so the President can decide, and that's why I think it matters what we're trying to establish as a matter of fact is – Sir. Okay, one second. I'm sorry, Mike. You don't have the right to speak up, sir. Well – The President – so you say that there's a mistake or confusion over who is being recognized and what the status is. I'm trying to understand whether your claim is the mistake is that whether the President and people acting on his behalf did receive Mr. Mankato's father in the mistaken authority or they received it something else and the records since then have gotten lost and that we're getting it wrong. The President actually received him in a non-immune status, and subsequent mistakes of fact have led us to believe that he was received in an immune status. The latter argument. The counsel – he was a counsel. He was not an ambassador ever. Right, I'm referring to the – You're going to have to be removed if you continue to disrupt the proceedings. If there's something you want to give counsel, you can do it when he goes back to his seat, but you cannot disrupt the proceedings, please. He was a counsel but not having the diplomatic immunities because that was a mistake made upwards by including up to the President of the United States who erred in getting the wrong information. The wrong information provided that there was an assumption that Dr. Mankato was in fact a counsel because he was an attache at the time. But anyway, if I can move on to another argument. The other thing is the Dr. – Mr. Mankato's wife – I'm sorry, mother, his father's wife, was in LPR, admitted as an LPR at the time. Your brief mentions this and I can't figure out what you mean when you say at the time. She was an LPR when? When she entered the United States in the 1940s. Did she enter married to him? No. That's what I thought. They married here? Correct. Okay. And then so what was her status as of the time of the date of his birth? A green card holder. An LPR, lawful permanent resident. But she would have also had whatever status his family had, right? I understand. But we have cited rules that because she's either a U.S. citizen or a national, and in this case we would argue that the U.S. citizen or a national owing permanent allegiances to the United States at the time would subject Dr. – Mr. Mankato to having jurisdiction – the United States has jurisdiction over him at his birth in New York because she was a permanent resident at the time and at all times. When you say at all times? At all times before he was born and when he was born. She was still a permanent resident. But wouldn't she also have had whatever status your client's father's family had? The immediate family got the status that he was given, right? So the question still comes back to what status was he given? There's two problems with that. The first argument obviously goes back to our first argument that he was not even a dip– I understand that, but you have a minute and a half left, so let me get to this if I could because I am troubled by this. If she had been unmarried but had LPR status, and as I understand it, she had LPR status on the day of his birth. Yes. All right. So the government will speak to this. I'll ask the same question, but it seems to me the government's position is that his mother then actually had both statuses. She couldn't have both statuses because she couldn't get a visa. She could not get a diplomatic visa. Secondly, because she's a lawful permanent resident, she cannot get visas because they're already permanent. So, sir, if you'd let me ask my question? Yes, Your Honor. My question is would he be entitled to citizenship as a result of birth by his mother, who was an LPR, notwithstanding his father's status? Yes, he would. He would be able to make that argument? The menu below, Your Honor, and we made that argument in my reply brief, Your Honor. Well, maybe the government can speak to that because it's one of the things that's bothering me. Okay, Your Honor. All right, counsel. If you could get whatever information is being sought to give you, you can bring that back on your rebuttal. Thank you, counsel. Thank you, Your Honor. Good morning, counsel. Good morning, Your Honors. Ruthann Mueller on behalf of the United States. Your Honors, there are two ways to obtain citizenship under the 14th Amendment. The first, being born subject to the jurisdiction of the United States. The second, applying for naturalization. Can I ask about the first? My problem is it seems to me there's places in his briefing where he says that his mother was an LPR status. If she hadn't been married, just setting his dad aside, why isn't he entitled to citizenship vis-a-vis his mother? He was born in New York, right? Yes, Your Honor. He was born in New York. The issue of Mrs. Morales' status at the time of Mr. Moncada's birth is a red herring in this case, Your Honor. This issue, the relevance of Mrs. Morales' status, had not come up in the district court proceedings at all, and for three other reasons. First, we know when Mrs. Morales applied for legal permanent residence status. It was in the 1970s, and that is in the government supplemental extract of record. That was attached to the government's motion for summary judgment. He didn't have it earlier? We don't know that, Your Honor. Well, he's asserted that she did, so that's a, okay. I've got a bullet point for that. What's your two other points, please? Your Honor, second, Mrs. Morales appears on the USUN blue list, and we know that Dr. Moncada and Mrs. Morales then both were afforded full diplomatic agent levels. Right, so as a matter of law, if that's the case, let's just take a hypothetical. Because I don't understand how this works, of course, and we don't see these cases very often. But if she had LPR status, I don't know if that's right. That is certainly alleged. If she had that status on the date of his birth, would the fact that she was married to his father, and dad's immediate family would have had diplomatic status, does that somehow negate his entitlement to citizenship that he would have had vis-a-vis his mother? Yes, Your Honor, because, one, the privileges and immunities were derived from Dr. Moncada, not Mrs. Morales. But it's not like his mom didn't exist. I understand the privileges and immunities flowing from, but if he had both, right, if he had that, I'm trying to figure out how his father's diplomatic status would somehow negate his right to citizenship if he would have otherwise had it vis-a-vis his mother's lawful presence in the country on the date of his birth. If Mrs. Morales was a legal permanent resident at the time of Mr. Moncada's birth, Mr. Moncada would still have been born not subject to the jurisdiction of the United States because Mrs. Morales was an LPR, not a national under the VCDR. So he couldn't have. The answer to my question is yes. In other words, having a father who had diplomatic status would disentitle him to citizenship as a matter of law? Yes, Your Honor. Okay, so that's helpful. Can you tell me where do I look for the legal authority supporting that proposition? That would be in the government's briefing, Your Honor, the answering brief. Okay. Our argument starts on page 1, Courts Indulgence. Sure. Thank you for digging it out. I think you did brief this, but I'm not sure it really put this question to bed for me, so okay. Page 42, Your Honor, of the government's brief. 42. Okay, so unfortunately that's the page that I have tabbed. Sorry. So the other premise, the initial premise that his mother had LPR status when she came to this country is quite different than what you just represented because your records show that she obtained or applied for it in the 70s, you said. Yes, Your Honor. Was that tracked to ground? Excuse me, Your Honor? Did the district court make any findings about that? No, Your Honor. So again, the fact that Mrs. Morales was an LPR at that time, it was attached to the government's motion for summary judgment reply, but the relevance of that status was not before the district court during the trial. Well, so page 42 of your brief, the relevance wasn't because the argument wasn't presented to you? Yes, Your Honor. Okay. And there was no evidence, separate evidence submitted at trial regarding Mrs. Morales' status because it's not relevant to the inquiry that's before the court today? Just was Dr. Mankata? That's a conclusion. You're saying it's not relevant to our inquiry today, and I don't know if that means you're taking the position that this argument was not exhausted. That would be one reason. Or if you're taking the position that as a matter of law, even if she had LPR status, it wouldn't entitle him to citizenship? As a matter of law, Your Honor. Okay. Thank you for your patience with my questions. So as a matter of law, which law? The Vienna Convention had not been ratified at the time of Mr. Mankata's birth? Yes, Your Honor. So even though that this case occurred, the facts of this case occurred before the VCDR, the parties are in agreement that the VCDR, which codified longstanding diplomatic immunity laws, would apply in this case. Not the VCDR, but the international law principles that it codified. Okay. So on page 42, your position is just the relevance of Mr. Morales' immigration status at the time of Mankata's birth was not raised at trial. And then it says C-2ER-92. And I had trouble getting to C-2ER-92. But it sounds like your position was not, it was limited to the fact that it's unexhausted. Do I misunderstand this part of the brief? It's a matter of law. So on page 42 is where our position begins. On page 43, I go through the, in 44, I go through, it goes through those three examples that I gave as to why the LPR status of Mrs. Morales. One, she did not, based off the briefing or based off our evidence, we know when Mrs. Morales applied for LPR status. And even if she wasn't LPR at the time of Mr. Mankata's birth, he still would have not been born instead of Jackson. Well, this argument on page 43 really, and these authorities, I'm happy to retrace these steps. I'm not an expert in this area by a long shot. As I said, we rarely see these cases. But I understood these authorities to stand for the proposition that, and I think this is your argument, that somehow, well, I understood these authorities to stand for the proposition that notwithstanding his mother's status, he would have been subject to his dad's immunity. He would have been entitled to that diplomatic status. That's quite different than saying that the diplomatic status somehow wipes out his right to citizenship vis-a-vis his mother. Yes, Your Honor. So if you go to the bottom of page 44. Okay. This is Artiga v. Mkazi, which is a case in front of this court. That determines whether or not an LPR is a national. And the language of the VCDR says that individuals who are nationals of the country would not have diplomatic immunity. But Mrs. Morales was not a national at that time. Even if she had legal permanent residence status, she had not applied for citizenship, which was the facts in that case, and whether or not she had owed an allegiance to the United States at that time. So even if she was an LPR, that would not change the analysis here. Well, I think it doesn't change the analysis because you keep telling me that regardless, I think you're saying that regardless of her status, because she was married to her husband, she was going to have diplomatic status. Yes, Your Honor. If Mrs. Morales was a citizen. Counsel, that's what I'm trying to get at. I'm not fighting that. I'm trying to figure out if she also had LPR status, if she had a green card during this period of time. She would not hold both statuses at the same time? It's possible, Your Honor. I don't know the exact answer to your question, but I do know that if she was a citizen, then she would not have diplomatic immunity because she would be a US citizen. Okay, but nobody suggests she was a citizen. Yes, Your Honor. So that's off the table, or I've really misperceived the status here. I'm trying to figure out whether or not if it was, it sounds like your position is it wasn't shown, that his mother was in LPR status at the time. I don't know if he could prove that, but I am quite interested in figuring out that if he could, whether that would make a difference. And it sounds like your first argument is he didn't raise it, so you consider that argument to be unexhausted. And it sounds like the second argument is that… Well, we know when she applied for LPR status in the 1970s, and third, even if she was in LPR at the time that he was born, that does not change the fact that he was born not subject to the jurisdiction of the United States because… But that's because of his father. Because of his father, yes. Yeah, but I'm trying to figure out why his father's status wipes out his mother's status. Because, Your Honor… Because otherwise he would be entitled to citizenship. Because the privileges and immunities were derived from Dr. Mercado because he was the one that was afforded full diplomatic immunity. I think we're going in circles a little bit in terms of the argument. Mr. Mercado's situation, which is a grave mistake by our government, he's bringing a claim under the 14th Amendment, and his entitlement that he's claiming is under the 14th Amendment. Now there are statutes and conventions and other things coming down. But I guess to pick up on your discussion with Judge Christin, why doesn't that inquiry come first? Why are we looking to all of these mistake of fact, mistake of law? Why are we looking to questions of the niceties of how this works in the ordinary course with respect to the immunity of people in cases when the Constitution has to come first? In other words, why would his birthright citizenship, as alleged, not overcome whatever international law which is subordinate to the Constitution that would be the source of the immunities? Yes, Your Honor, and it does go back to the Constitution. It goes back to the reception clause where the executive is able to determine who will be a diplomat in the United States. And from there, the executive, the Department of State— Why is that the starting point? Judge Johnson's asking a different question. He's asking a different question. Yeah, I understand that the jurisdiction is a product of that. Of course, that just takes us back into the fact that we— I don't think the government suggests even that there is— that we have direct proof of the president's recognition of Mr. Mankata's father for purposes of immunity, right? There isn't—there's an executor, but you don't rely on that. You rely on a certification. Yes, Your Honor. Six, seven presidential administrations later. Yes, Your Honor. I understand that we may be bound by President Truman's recognition if that were the case, but the government doesn't seem to be relying on that. It's relying on M.C. Donovan's certification. So that's one piece. I mean, I guess I should say, what would you suggest is— what is the best—not in the technical term, although we'll raise that too— what is the best piece of evidence we would look at to see that the president in fact conferred status that— from which this immunity flowed under the 14th Amendment? Your Honor, you would look at the certification. The certification is not from the president. But it's from the executive, Your Honor. It's from a different executive. And my concern when we're dealing with the 14th Amendment and all of our rights to be birthright citizens in this country is that a post hoc certification that itself doesn't seem to rely on anything else than the evidence that was presented at trial should not overcome a putative citizen's constitutional right to be a citizen of this country because he was born here subject to the jurisdiction of our laws. Understood, Your Honor. And again, the decision that was made to afford the diplomatic privileges and immunities to Dr. Moncada was not post hoc. It occurred in 1950. We have that documentation. And if the court does not want to accept the certification as conclusive, it can do what the district court judge did and find it as highly persuasive in looking at the certification. The USUN blue list, which Minister Counselor Donovan testified, is the key piece of evidence in determining if someone has been afforded full diplomatic privileges and immunities as a member of a permanent mission to the United Nations. Okay, so the certification you're talking about is not the Donovan certification now. It is a Donovan certification, Your Honor. Is there evidence here that is there a document from that? So let's start with the executor. Yes, Your Honor. It seems like that doesn't govern here. The executor is from the president and seems like the sort of document by which a president would exercise their reception power. But the government's not relying on that exclusively. Why is that not conclusive evidence? Yes, Your Honor. We're looking at the executor, and this is on ER 182. This predated the time that Dr. Mankata received full diplomatic privileges and immunities. Would there have been a similar document that would have been issued that is now lost to establish his status at the time of Mr. Mankata's birth? In 1950 contemporaneously?  Not that I'm aware of, Your Honor. Not that you're aware of that one doesn't exist or that the president would have never received the credentials or done some formal act of recognition? Well, the credentials were received at the host country affairs office at the U.S. Mission to the United Nations. Okay. So as the agency and the executive who's in charge of the one office that's in charge of affording diplomatic privileges and immunities to individuals, they would have had that information. And we have the assignment sheet where the sending state here in Nicaragua contacted the U.N. Office of Protocol to register Dr. Mankata as an attache. But unlike the prior executor, the government does not then, whether it does now, the president never has eyes on that particular thing. That's not a direct exercise of Article II power. That's a matter of recordkeeping that didn't go too well in this case. Yes, Your Honor, because not every individual will have a certification put together. It's not a standard course of putting together a certification. What is standard course is being on the U.S. U.N. blue list if you have full diplomatic privileges and immunities. You will have a cardex created. You would have this U.N. Office of Protocol. Sorry, you'll have a what created? Sorry, I'm trying to. A cardex, Your Honor, and this is in the record. Okay. I just didn't hear your word. Okay. 263. Yep, yep, yep. You would have the U.N. Office of Protocol registration list. You would also have, and the government was unable to find this, and the district court credited the fact that it would have been an ordered document and was not able to find it. The individual would also have a request for privileges and immunities made from the U.N. Office of Protocol. That document we were not able to find, but that district court found that even though that omission is present in the record, that does not change the totality of the evidence before the court and the district court that Mr. Mankato was not born subject to the jurisdiction of the United States. But that would be the gold standard from the government standpoint. It's just we don't have it. Your Honor. So we're looking at evidence through the Blue Book and other things that are circumstantial evidence that that, in fact, was conveyed. Yes, Your Honor. And I would say that the gold standard here would be the certification, but if the court, as the court in Luthana and the D.C. Circuit found, however, if the court is not inclined to find the certification conclusive, it can still affirm for the government, in favor of the government, what the district court found, which was that Mr. Mankato was not born subject to the jurisdiction of the United States. All right. Thank you, counsel. Thank you. Rebuttal. If I may please the court. On ER-28, I have found the document that was before the district court, which is, in fact, the permanent evidence that Mrs. Mankato, Blanca Bertha Morales, age 21, was arrived in the United States as a permanent resident. What's the date? She arrived when? May 21, 1947. And if we look at this document, in particular, line 13, it says length of intended stay, it says permanently. Counsel, was that, you say it's ER-28. This was, it sounds like from opposing counsel, this issue was not litigated. This was brought forward. ER-28 was before the district court? It was attached to the complaint for injunctive and declaratory relief. Okay. And so did you argue in the district court that your client was a citizen by birth as a result of his mother's status? This argument was brought forward, yes. In fact, it was part of the argument brought forward by counsel at the district court level. So the district court just didn't rule on it? The district court did not make a, did not take this into account, I believe, to make a finding that he was, in fact, subject to the jurisdiction of the United States. Did I make an appropriate? Generally, the district court will at least address the argument, though, if it's made. Right. But I think the, or that the district court, I believe, went with the government's argument, but I believe that was an error because, in fact, he was subject to the laws of the United States because she is a permanent resident, not the 1976 permanent residency, which she got subsequently as well because Mr. Moncada did apply for her. We understand the argument. We're trying to make sure you made it. Yes. The argument was made. Yes, Your Honor. So is it your position that if one has a child, when they're in LPR, that the child becomes a citizen of the United States? Is that your argument? Yes, because that person who's a permanent resident is considered a national of the United States or is either a citizen or national. Those individuals, A, cannot get visas, and, B, they're not able to get diplomatic immunity because of the fact that they're still a permanent residence. Their permanent residence would have had to have been withdrawn because they have a permanent allegiance to the United States. Do we have a case that says someone who is an LPR that has a citizen, that child becomes a citizen? One second. There was an argument made on that. That's okay. We'll figure it out. Do you have any closing remarks? Other than to state that Dr. McCarty just finally state that his father was not, as an attache, was not attached to the list that should have been on the blue list that was relied upon by the government and Mr. Donovan was incorrect and the district court had erred, and also he didn't have an APA hearing as a U.S. citizen, as a U.S. national, and that, in fact, the government did, in fact, write on his passport an ER-47 that his United States birth certificate, I'm sorry, not ER-47, on one of his birth certificates there was a stamp sent back to him where it was said not to be used for U.S. citizenship purposes. So now he's like the person in the terminal. He's not a citizen of any country at the moment. That's unfortunate, very unfortunate. Yes. All right, thank you, counsel. Thank you to both counsel. The case is argued and submitted for decision by the court. We'll be in recess until 1130. Thank you, judge. All rise. This court is in recess until 1130.
judges: RAWLINSON, CHRISTEN, JOHNSTONE